# EXHIBIT D

**KNIGHT LAW GROUP, LLP**
Steve Mikhov (SBN 224676)
Lauren A. Ungs (SBN 273374)
1801 Century Park East Suite 2300
Los Angeles, CA 90067
Telephone: (310) 552-2250
Fax: (310) 552-7973

**LAW OFFICES OF MICHAEL H. ROSENSTEIN**
Michael H. Rosenstein (SBN 169091)
Radomir R. Kirnos (SBN 283163)
1801 Century Park East Suite 2300
Los Angeles, CA 90067
Telephone: (310) 286-0275
Fax: (310) 286-0274

Attorneys for Plaintiff,
HECTOR CAZARES

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF LOS ANGELES

| | |
|---|---|
| HECTOR CAZARES, | Case No.: BC635153 |
| Plaintiff, | Unlimited Jurisdiction |
| vs. | **DECLARATION OF DR. BARBARA C. LUNA** |
| FORD MOTOR COMPANY, a Delaware Corporation, and DOES 1 through 10, inclusive, | |
| Defendant. | |

I, Dr. Barbara C. Luna, declare:

1.  I am over 18 years of age.  The facts stated herein are within my personal knowledge.  If called as a witness, I could and would testify competently.

- 1 -
DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.1**

**Work and Educational Background**

2.   I am a Senior Partner in the accounting and litigation services firm of White, Zuckerman, Warsavsky, Luna & Hunt, LLP ("White Zuckerman").  I analyze financial, accounting, indicia of fraud, economic, business, real estate and valuation issues relating to liability and damages in litigation matters and reorganization of businesses.  I have testified as an expert on my findings in over 500 trials and arbitrations during the past 39 years.  I have also testified in well over 500 depositions as an expert witness during the same period.

3.   Prior to joining White Zuckerman, I was a Partner with Coopers & Lybrand specializing in litigation and financial advisory services.  Prior thereto, I was the National Director of Litigation Consulting for Kenneth Leventhal & Company, where I was responsible for directing the litigation services practice nationwide.  Previously, I was a Partner with Pannell Kerr Forster, where I was responsible for providing litigation and reorganization services, and was a Senior Manager with Price Waterhouse specializing in litigation services.  Before focusing on litigation services, I was an investment banker specializing in corporate finance.

4.   I obtained my BA degree from Wellesley College, and my MS and PhD degrees in Applied Mathematics from Harvard University.  I have taught graduate and undergraduate courses in working capital management, business finance, forensic accounting and intermediate accounting at UCLA Graduate School of Management, California State University at Northridge and Pepperdine University.  I have also addressed numerous audiences and appeared on several professional panels.

5.   I am a Certified Public Accountant, a Certified Fraud Examiner, Certified in Financial Forensics, a Master Analyst in Financial Forensics, an Accredited Senior Appraiser in Business Valuation, Accredited in Business Valuation, a Certified Valuation Analyst, a Certified General Real Estate Appraiser, a Certified Commercial Real Estate Appraiser, a Certified Residential Real Estate Appraiser, a Certified Management Consultant, and a Diplomate Board Certified Forensic Examiner and Accountant.  I am also a member of the American Institute of Certified Public Accountants (and hold the AICPA's CFF and ABV designations), the California Society of

- 2 -
DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.2**

1  Certified Public Accountants (and the Society's Economic Damages, Fraud and Business Valuation

2  Common Interest Member Services Committees), the Association of Certified Fraud Examiners, the

3  Association of Business Trial Lawyers (and the Association's Committee on Experts), the National

4  Association of Forensic Economists, the American Boards of Forensic Examiners and Accountants,

5  the American Society of Appraisers, the National Association of Certified Valuation Analysts, the

6  National Association of Real Estate Appraisers, and the Institute of Management Consultants.  My

7  Curriculum Vitae is attached hereto as **Exhibit 1**.

8

9                                    **Assignment**

10        6.   I have been retained by Knight Law Group, LLP and Law Offices of Michael H.

11  Rosenstein, attorneys of record for Hector Cazares, to testify in Plaintiff's case as to matters

12  including, but not limited to, indicia of fraud, corporate business culture, customs and practices,

13  industry standards of misrepresentation, concealing or omitting material information, the materiality

14  of such information, repeated intentional misrepresentations, omissions and concealments,

15  corporate philosophy and risk management strategy.

16        7.   I have also been retained to testify as to the valuation of damages based on the financial

17  impact of misrepresentations, omissions and concealments, the quantification of underlying and

18  punitive damages relating to the culpability of the Defendant, the quantification of the Defendant's

19  conduct including, but not limited to, the repeated wrongdoing, and profitability of the scheme.

20        8.   Fees for my firm, White Zuckerman, range from $130 per hour to $495 per hour

21  depending on the level of experience of personnel.  My fees for time spent testifying are $495 per

22  hour.  Our compensation is not contingent upon my testimony, or upon any outcomes or court

23  proceedings.  I have no interest, either present or contemplated, in the parties on which the report,

24  analysis and testimony may be based.

25

26

27

28

- 3 -

DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.3**

**Background**

9.  This case arises from alleged intentional misrepresentations, omissions and concealments by Ford Motor Company ("Ford," "FMC" or "Defendant") relating to the purchase of a used 2011 Ford Fiesta ("Subject Vehicle") by Hector Cazares ("Plaintiff").  Plaintiff alleges the Subject Vehicle was delivered by Ford with serious defects and nonconformities to warranty and developed other serious defects and nonconformities to warranty including, but not limited to, transmission defects.[1]

10. Plaintiff alleges Ford's PowerShift Transmission slips, bucks, kicks, jerks, harshly engages, has premature internal wear, sudden acceleration, delay in downshifts, delayed acceleration, difficulty stopping the vehicle, and eventually, premature transmission failure (the "Transmission Defect"), which causes unsafe driving conditions and presents a safety hazard.[2]

11. Plaintiff further alleges that Ford knew, or should have known, about the PowerShift Transmission design and manufacturing defects through its exclusive knowledge of non-public, internal data about the Transmission Defect.  Ford and its agents appear to have actively concealed the Transmission Defect, and appear to have failed to inform the Plaintiff at the time of purchase or any time thereafter.[3]

12. On January 29, 2012, Plaintiff purchased a used 2011 Ford Fiesta, VIN: 1FADP4FJ7BM207799 from South Bay Ford, Inc. in Hawthorne, California.[4]

FORD'S POWERSHIFT TRANSMISSION

13. Ford's PowerShift Transmission is the sole "automatic transmission" option on the Subject Vehicle.[5]  The PowerShift Transmission is neither a traditional manual transmission nor an automatic transmission, but rather is a computerized "automated manual" transmission.[6]

---

[1] Exhibit 2 – Complaint, filed September 23, 2016, ¶3.
[2] Id., ¶¶19 and 20.
[3] Id., ¶¶22 and 23.
[4] Exhibit 3 – Lease Agreement.
[5] Exhibit 2 ¶10 and Exhibit 4 – 2011 Ford Fiesta Brochure.
[6] Exhibit 2 ¶11.

- 4 -
DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.4**

1      14. Ford marketed and sold its PowerShift Transmission as the best of both worlds between

2  a manual transmission and an automatic transmission, combining the efficiency of a manual

3  transmission with the ease of operation of an automatic transmission.  Ford's PowerShift

4  Transmission is not an automatic transmission, but a set of computerized manual transmissions.

5  And instead of using a "wet" clutch, like similar "automated transmissions," the PowerShift uses

6  two "dry" clutches.[7]

7      15. According to a Ford press release on March 10, 2010, "Powershift with dry-clutch

8  facings and new energy-saving electromechanical actuation for clutches and gear shifts saves

9  weight, improves efficiency, increases smoothness, adds durability and is sealed with low-friction

10  gear lubricant for the life of the vehicle.  The transmission requires no maintenance."[8]

11

12  <u>FORD APPEARS TO HAVE PRODUCED AND SOLD VEHICLES WITH KNOWLEDGE OF A DEFECTIVE</u>

13  <u>POWERSHIFT TRANSMISSION</u>

14      16. Ford appears to have had exclusive knowledge of the Transmission Defect through

15  sources that were not available to consumers, and it appears that the Transmission Defect was not

16  known or reasonably discoverable by Plaintiff before he purchased the vehicle on January 29, 2012,

17  including:

18      a)  Similar defects were found in the European and Australian models, which were

19  offered in those markets before the United States.  The European and Australian models have a

20  similar dual-clutch transmission, although it is "wet" and not "dry" like U.S. models.  Ford even

21  acknowledged in its own press release that the transmission offered in U.S. models is a "derivative"

22  of the European and Australian design.  Those designs suffered similar defects as the U.S. design.[9]

23      b)  Ford had access to years of pre-release testing data and feedback from the

24  European and Australian markets for the dual-clutch transmission.  According to Ford, its team

25  "logged approximately three years and 6,000 man-hours of computer aided mathematical modeling,

26

27  [7] Id., ¶¶15 and 16.

      [8] **Exhibit 2** ¶17 and **Exhibit 5** – Ford Press Release, March 2010.

28  [9] **Exhibit 2** ¶¶24 and 44.

DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.5**

1  simulation and analysis of engine speeds, torque and clutch capacity in only 24 months real time to

2  prove the THF [torque hole filling] concept was production ready."[10]

3         c)   Complaints received from consumers and automotive journalists regarding the

4  PowerShift Transmission and testing done in response to those transmission complaints.  A July 15,

5  2011 *New York Times* review criticized the PowerShift Transmission's "jerks, pauses and lethargic

6  accelerations."  In the same article, a Ford engineer named Greg Burgess admitted that Ford made

7  "tradeoffs" in terms of drivability in order to "deliver something that is very, very fuel efficient."

8  The review further stated: "the logical explanation is that they [Ford engineers] were given a fuel

9  economy target and no option but to meet it.  One might wonder why a top executive didn't step in

10  to keep the transmission from reaching market."[11]

11      17. Therefore, it is my understanding that Ford appeared to have had knowledge of the

12  Transmission Defect, and appeared to have known or should have known that the defect was not

13  known by or reasonably discoverable by Plaintiff before Plaintiff leased the Subject Vehicle.  Ford

14  appeared to have had knowledge that the root cause defect in the PowerShift Transmission could

15  not be repaired under applicable warranties.  A timeline of observations of FMC's appearance of

16  knowledge of the Transmission Defect is provided in **Exhibit 30, Schedule 6**.

17

18  <u>FORD APPEARED TO HAVE CONCEALED THE TRANSMISSION DEFECT AND APPEARED TO HAVE</u>

19  <u>INTENTIONALLY MISREPRESENTED THAT VEHICLES WERE OF HIGH QUALITY EVEN THOUGH IT</u>

20  <u>APPEARED TO HAVE HAD KNOWLEDGE OF THE TRANSMISSION DEFECT</u>

21      18. Ford appeared to have had knowledge that the PowerShift Transmission was defective,

22  yet actively concealed the existence and nature of the Transmission Defect from Plaintiff at time of

23  sale, repair and thereafter.[12]  The defective Powershift Transmission was used by Ford in their

24

25

26

_____

27  [10] **Exhibit 2** ¶24 and 25 and **Exhibit 6** – Ford Press Release, January 2011

[11] **Exhibit 2** ¶¶46 and 47 and **Exhibit 7** – *New York Times* article.

28  [12] **Exhibit 2** ¶39.

DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.6**

1  2011-2013 Ford Fiesta vehicles and 2012-2013 Ford Focus vehicles[13].  A timeline of my

2  observations is provided in **Exhibit 30, Schedule 6.**

3  　　　　a)  In September 2010, Ford issued a TSB (Technical Service Bulletin) covering the

4  2011 Fiesta informing dealers and service personnel of "concerns such as no engagement or

5  intermittent no engagement in Drive or Reverse when shifting Park to Drive or Reverse, grinding

6  noise during engagement, and/or check engine light with transmission control module (CM)

7  diagnostic trouble code…"[14]

8  　　　　b)  On January 1, 2011, Ford issued a TSB, covering the 2011 Fiesta, informing

9  dealers and service personnel of problems with the PowerShift Transmission causing "a loss of

10  power, hesitation, surge, or lack of throttle response while driving."[15]

11  　　　　c)  On March 31, 2011, Ford issued a TSB, covering the 2011 Fiesta, informing

12  dealers and service personnel of problems where the PowerShift Transmission "exhibit[s] a

13  rattle/grind noise in reverse only."[16]

14  　　　　d)  On May 25, 2011, Ford issued a TSB covering the 2011 Fiesta addressing

15  problems with the PowerShift Transmission engagement stating "may exhibit engine start concerns,

16  no crank, no start, hard start, intermittent start, noise during start and/or various automatic

17  transmission engagement concerns in Drive or Reverse when shifting from Park including no

18  engagement, delayed engagement, intermittent engagement, noise during engagement…"[17]

19  　　　　e)  On May 26, 2011, Ford issued a TSB covering the 2011 Ford Fiesta addressing

20  problems with the PowerShift Transmission including "may exhibit transmission engagement

21  concerns in Drive or Reverse when shifting from Park to Drive or Reverse, no engagement, delayed

22  engagement, intermittent engagement, noise during engagement…"[18]

23

24

25

26  [13] **Exhibit 2** ¶3.
[14] Id., ¶31 and **Exhibit 8** – September 2010 Technical Service Bulletin. Replaced by TSB 11-5-23

27  [15] **Exhibit 2** ¶32 and **Exhibit 9** – January 1, 2011 Technical Service Bulletin.
[16] **Exhibit 2** ¶33 and **Exhibit 10** – March 31, 2011 Technical Service Bulletin.

28  [17] **Exhibit 2** ¶34 and **Exhibit 11** – May 25, 2011 Technical Service Bulletin.
[18] **Exhibit 2** ¶34 and **Exhibit 12** – May 26, 2011 Technical Service Bulletins.

DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.7**

1    f)   In July 2011, Ford implemented a communications strategy to "improve

2   customer expectations" about the behavior characteristics of the PowerShift Transmission.  Ford

3   also noted that some common and normal characteristics of the PowerShift Transmission include

4   double clicking metal sounds, coast down whine, low speed grinding and a reverse gear whine.[19]

5    g)   In September 2011, Ford issued a TSB advising dealers to reprogram the

6   transmission computer of 2011 Fiestas whose owners complained about "hesitation when

7   accelerating from a low speed after coast down, harsh or late 1-2 upshift, harsh shifting during low-

8   speed tip-in or tip-out maneuvers and/or engine r.p.m. flare when coasting to a stop."  Another TSB

9   also issued in September of 2011 informed dealers and service personnel of 2012 Focus

10  transmission problems including: "RPM flare on deceleration coming to a stop, rough idle on

11  deceleration coming to a stop, intermittent engine idle fluctuations at a stop, intermittent vehicle

12  speed control inoperative, intermittent harsh engagement/shift…"[20]

13    h)   In May 2012, Ford issued a "Customer Satisfaction Program: Program Number

14  12B37."  Ford sent a letter to Focus drivers indicating that they "may experience rough or jerky

15  automatic transmission shifts.  In addition, the vehicle may experience roll back when the driver is

16  transitioning from the brake pedal to the accelerator pedal while on a slight incline."  However,

17  Ford issued no recall, nor did it inform drivers of any potential safety issues.[21]

18   19. Despite its apparent knowledge of the Transmission Defect, Ford appeared to have

19  concealed its knowledge of the Transmission Defect.  Ford's marketing and advertising materials,

20  including its marketing brochures, advertised and represented that:[22]

21    a)   The 2011 Fiesta with the PowerShift 6-speed automatic transmission "shifts

22  crisply and efficiently to keep you smiling" and "responds in an instant, when needed."

23    b)   The 2011 Fiesta with an available "PowerShift 6-speed automatic transmission

24  can provide torque to the wheels 100% of the time during shifts, for an extra-connected feel."

25

26  ────────────────────

27  [19] **Exhibit 2 ¶56 and Exhibit 13** – Ford Memo to its Dealers and Service Personnel.
    [20] **Exhibit 2 ¶¶35 and 36 and Exhibit 14** – September 2011 Technical Service Bulletins.

28  [21] **Exhibit 2 ¶37 and Exhibit 15** – May 2012 Customer Service Satisfaction Program.
    [22] **Exhibit 4** – Marketing Brochure year 2013 Focus, p. 4.

- 8 -

**EXHIBIT 68.8**

20. Plaintiff's Ford Fiesta came with a New Vehicle Limited Warranty, which provided the following general warranty coverage:[23]

    a)  3 year / 36,000 mile bumper-to-bumper coverage;

    b)  5 year / 60,000 mile powertrain coverage;

    c)  5 year / 60,000 mile safety restraint coverage; and

    d)  5 year / unlimited corrosion coverage.

21. Ford recommended its customers follow these steps should they have any questions or concerns: (1) contact your Sales Representative or Service Advisor at selling dealership; (2) because not all selling dealerships are authorized to perform all warranty repairs, the vehicle may need to be taken to another dealer; and (3) if a particular dealership cannot assist, contact the Ford Customer Relationship Center.[24]

22. If warranty concerns cannot be resolved, Ford's warranty informs the customers that they are required to submit their warranty dispute to the BBB (Better Business Bureau) Auto Line program, which consists of two parts, mediation and arbitration. Ford's warranty also provides brief information on state warranty enforcement laws, or "Lemon Laws," which may allow owners to receive a refund of the purchase price under certain circumstances. However, Ford requires written notification first of any defects or non-conformities with the vehicle.[25]

23. The 5 year / 60,000 mile powertrain warranty covers the transmission against *__defect__* involved factory-supplied materials or workmanship. Covered transmission components include all internal parts, clutch cover, seals and gaskets, torque converter, transfer case (including all internal parts), transmission case and transmission mounts.[26]

24. The PowerShift Transmission was allegedly defective in both materials and workmanship. Despite Ford being notified of the defects and non-conformities Plaintiff realized

---

[23] Exhibit 16, p 14.
[24] Id., p. 7.
[25] Id., pp. 15 and 39.
[26] Id., pp. 16 and 17.

- 9 -

DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.9**

1    from the Subject Vehicle, Ford appeared never to have cured the defects pursuant to the terms of its
2    express warranty.

3

4    FORD'S PROCESS DETAIL FOR THE FORD CUSTOMER SERVICE DIVISION (FCSD)

5        25. Ford has various guidelines and manuals it provides to its employees regarding Ford's
6    procedures for its FCSD regarding the handling of various customer related issues.  Initially, a
7    FCSD representative determines the reason for the customer contact and determines the course of
8    action based on information to provide based on Ford's "Smart Script path and customer
9    phraseology" from its software.  If need be, additional information is documented in Ford's various
10   informational databases like CuDL (Customer Data Link), GCQIS (Global Common Quality
11   Indicator System) and Siebel System, (now called FMC 360), among others.  In instances where
12   further, or higher level, assistance is requested, the FCSD representative transfers the customer to
13   the appropriate FCSD destinations.  This is generally a "Tier I" level contact.[27]
14       26. For vehicle concerns like unresolved issues, including repair issues, customers are
15   directed to various customer service agents depending on their issues like a DRP (Dispute
16   Resolution Program), CLP (Customer Loyalty Plan), Buyback Request, etc.  If customers are
17   requesting financial assistance or are "At Risk," they are considered "Tier II" customer escalations
18   and are handled by the FCSD Customer Care Solutions Team.  "At Risk" is defined as: (i) multiple
19   repair attempts; (ii) >10 days out of service; (iii) unable to duplicate; (iv) customer perceived two or
20   more repeat repairs; and (v) parts delay. The FCSD Process Detail suggests that every attempt be
21   made to help the customer work with the dealer to resolve the problem.  Problems are ranked from
22   low to high levels of a 01 case to a 04 case.  The 04 case is high risk.  Ford's FCSD system instructs
23   its customer service personnel to document each phase and what "phraseology" to provide
24   customers at various levels, 02, 03, 04.[28]

25

26

27   [27] Exhibit 17 - FCSD Customer Care Team Process Detail 11/2/10.
28   [28] Exhibit 18 – FCSD Customer Care Solutions Team Process Detail 3/4/10.

- 10 -
DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.10**

27. The FCSD Process Detail also deals with the handling and escalation of Tier II high risk cases for RAVs (Reacquired Vehicle), Buyback Request (civil penalty states including CA), and Lemon Law claims, among others.[29]

28. For the state of California, a Lemon Law Rights Period is not specified, but applies to the entire manufacturer's written warranty. The FCSD Customer Care Solutions Team is assigned to investigate the issue. Ford offers an arbitration process through the Better Business Bureau Auto Line, as part of Ford's Dispute Resolution Program. The arbitration decision is binding if the customer agrees to the decision. Customers could explore other options if they do not want to proceed with this arbitration process or do not like the decision. Ford's buyback requests are not handled through the BBB Auto Line arbitration process.[30]

29. The alleged non-disclosure to purchasers and lessees of the vehicles with the Transmission Defect problems appears to be at odds with the customer-helpful attitude portrayed in Ford's customer service training materials for handling unresolved repair and Lemon Law issues.

FORD CODE OF CONDUCT

30. Ford has a written Code of Conduct Handbook, prepared in November 2007, which emphasizes its corporate policies and directives regarding ethics, integrity, quality, supervision, responsibilities and communication, among other items, with its workforce and with the community.[31] A written Code of Conduct for Ford Motor Company prior to November 2007 has not been provided.

31. The alleged non-disclosure to purchasers and lessees of vehicles with Transmission Defect appears to be at odds with Ford's Code of Conduct emphasizing ethics, integrity and communication with its workforce (which includes dealers) and the community (which includes customers).

    a)  Mark Fields, Ford's President of the Americas and Chief Executive Officer, at

---

[29] Id.
[30] **Exhibit 19** – FCSD Case Management Customer Solutions Team 1/10/10, pp. 43 through 65.
[31] **Exhibit 20** – Ford Motor Company Code of Conduct 11/2007.

- 11 -
DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.11**

1   the time, states "It is critical that Ford Motor Company personnel around the world adhere to the

2   highest ethical standards so that we can earn the trust of our customers..."[32]

3          b)   Responsibility – "Ford Motor Company is committed to conducting business

4   fairly and honestly."[33]

5          c)   Product Quality and Safety – "the quality of our products and services must be

6   our number one priority today and tomorrow."[34]

7

8   PLAINTIFF'S EXPERIENCES

9          32.   Relying on the material misrepresentations, omissions and concealments by Ford, its

10  authorized agents, and its marketing materials regarding the 2011 Fiesta, including an "automatic"

11  transmission, Plaintiff purchased the Subject Vehicle on January 29, 2012, pursuant to the Retail

12  Installment Sales Contract.[35]

13         33.   Prior to purchasing the Subject Vehicle, Plaintiff had reviewed marketing materials at a

14  display for the Fiesta at the L.A. Auto Show and at the X Games in 2010 and specifically

15  remembers statements such as "transmission shifts smooth[ly]".[36]  Plaintiff also subscribes to a Ford

16  YouTube channel, where he saw articles and short videos about the Fiesta around the time he was

17  looking to purchase the Subject Vehicle.  When Plaintiff visited South Bay Ford in Hawthorne,

18  California, he was looking to purchase a Ford Fiesta vehicle and was "swayed" to purchase the one

19  with the automatic transmission because it was presented as getting better gas mileage.[37]  During his

20  visit to the dealership, Plaintiff reviewed window stickers of multiple Fiesta models, talked with the

21  salesperson, was provided a sales brochure, and test drove the Subject Vehicle.  The salesperson

22  never disclosed that the Subject Vehicle was not equipped with an automatic transmission.  In

23  addition to all the materials mentioned above, Plaintiff also subscribes to Muscle Mustangs & Fast

24

25  _____

    [32] Id., p. 5.
26  [33] Id., p. 7.
    [34] Id., p. 37.
27  [35] Exhibit 3.
    [36] Exhibit 35, pg. 51.
28  [37] Exhibit 35, pg. 48-49.

                                    - 12 -
                    DECLARATION OF DR. BARBARA C. LUNA

EXHIBIT 68.12

1    Fords and states that he saw similar advertisements as in those subscriptions he received and in the

2    brochures he received from the dealer and as shown on YouTube. [38]  In his deposition, he did not

3    mention that he reviewed any NHTSA investigations or TSBs.

4        34. Ford and its authorized agents allegedly did not disclose to Plaintiff any information

5    about the Transmission Defect.  Lack of disclosure of the Transmission Defect was material to

6    Plaintiff's decision to purchase the Subject Vehicle.[39]

7        35. Plaintiff had a total of $1,474.06 in warranty claims since purchasing the Subject

8    Vehicle.  Plaintiff began experiencing problems with the engine within 16,000 miles of purchasing

9    the Fiesta.  The vehicle was taken to an authorized Ford dealership approximately seven (7)

10   separate times that were covered by warranty for specific transmission related issues, including:

11   Transmission hesitates, makes clunking noises and jerks on takeoff.  The total known warranty

12   costs for the transmission related warranty claims as of the date of this declaration were $1,331.97

13   and are summarized below.[40]  Since there are at least three (3) warranty claims that do not appear on

14   the AWS Report (and therefore the corresponding amount of warranty repair is not known), the

15   total amount of warranty claims related to the transmission repair is subject to change if or when

16   additional information is received, at which time the declaration will be updated.  A timeline of my

17   observations regarding these repairs is provided in **Exhibit 30, Schedule 6.1.**

18        a)   February 28, 2013 – 30,633 miles – Issues with acceleration, deceleration and

19   gear shifts.  $23.40 was incurred in labor, parts and rental car covered under the warranty.

20        b)   September 8, 2014 – 46,058 miles – Transmission jerks on takeoff and makes

21   clunking noises.  $133.90 was incurred in labor, parts and rental car covered under the warranty.

22        c)   June 9, 2015 – 53,608 miles – Transmission hesitates and jerks on acceleration

23   and when coming to a stop.  $134.57 was incurred in labor and parts covered under the warranty.

24        d)   November 4, 2015 – 58,025 miles – Transmission jerks on takeoff.  $1,040.10

25   was incurred in labor and parts covered under the warranty.

26   _____

27   [38] **Exhibit 35**, pg. 52-58
     [39] **Exhibit 2**, ¶69.

28   [40] **Exhibit 21** – Warranty claims and repair data.

- 13 -

DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.13**

e)   March 17, 2016 – 60,371 miles – Transmission jerks on takeoff.  This visit does not appear on the AWS report; thus the amount incurred in labor and parts covered under warranty is not known at the time of this declaration.  Should this information be obtained, the declaration will be updated.

f)   May 26, 2016 – 61,296 miles – Transmission jerks on takeoff (related to visit on March 17, 2016, where a replacement clutch was ordered).  This visit does not appear on the AWS report; thus the amount incurred in labor and parts covered under warranty is not known at the time of this declaration.  Should this information be obtained, the declaration will be updated.

g)   April 17, 2017 – 66,083 miles – Transmission jerks on takeoff.  This visit does not appear on the AWS report; thus the amount incurred in labor and parts covered under warranty is not known at the time of this declaration.  Should this information be obtained, the declaration will be updated.

36. Ford initiated seven (7) manufacturer's recalls on the Subject Vehicle. Three (3) were for the transmission (two (2) published in August 2015 and one (1) in March 2016) and one each for the following: engine block heater leakage, enable auto-lock and auto-unlock features, reprogram Restrain Control Module and door latch replacement.[41]

37. Based on the information available to Ford regarding problems with the PowerShift Transmission and other issues prior to production, post production, and from Ford's own informational databases from customer repairs referenced above, Ford appears to have had knowledge of the Transmission Defect, and appears to have known or should have known that the defects were not known by, or reasonably discoverable by Plaintiff, before Plaintiff purchased the Subject Vehicle on January 29, 2012, or during the warranty period.  It appears that FMC then fraudulently induced Plaintiff to purchase the vehicle on January 29, 2012.

### Indicia of Fraud

38. Indicia of fraud is a term of art used by accountants and certified fraud examiners and is

---

[41] **Exhibit 22 – Ford Recalls.**

- 14 -

DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.14**

1  not a legal term. Indicia of fraud is not part of the knowledge of the general public or within the

2  public domain. Fraud investigation and the ability to recognize indicia of fraud are specialized

3  knowledge, which take years of study and practice as a certified fraud examiner to identify. Indicia

4  of fraud or indications of fraud is not a legal opinion and I am not stating that fraud occurred or did

5  not occur, which is the decision of the jury.  My observations do not invade the province of the jury,

6  but will aid them in determining whether FMC acted responsibly or whether their actions warrant an

7  award of punitive damages.

8      39. According to the Certified Fraud Examiners Manual (the "CFE Manual" or "Fraud

9  Examiners Manual"), "fraud includes any intentional or deliberate act to deprive another of property

10  or money by guile, deception, or other unfair means."[42]

11      40. One of the principles of fraud illustrated in the Fraud Examiners Manual includes

12  "concealment of material facts".[43]  The essential elements include:

13          a)  The defendant had knowledge of a material fact;

14          b)  The defendant had a duty to disclose the material fact;

15          c)  The defendant failed to disclose the material fact; and

16          d)  The defendant acted with intent to mislead or deceive the victim.[44]

17      41. Concealment can also include fraud by omission, the elements of which include:[45]

18          a)  The defendant must have concealed or suppressed a material fact;

19          b)  The defendant must have been under a duty to disclose the fact to the plaintiff;

20          c)  The defendant must have intentionally concealed or suppressed the fact with the

21  intent to defraud the plaintiff;

22  _____

23  [42] See **Exhibit 23** (2016 Fraud Examiners Manual), pp.1-5 (2.201-2.205).  See also **Exhibit 24**, p.2 (generally for elements for fraud by omission).  See **Exhibit 25** for other sources of definitions of fraud, including (among others): p.1

24  FRAUD ("Act or course of deception, an intentional concealment, omission, or perversion of truth, to (1) gain unlawful or unfair advantage, (2) induce another to part with some valuable item or surrender a legal right, or (3) inflict injury in

25  some manner."); p.3 OMISSION ("Apathy toward, or neglect of, duty resulting in something not properly done or remaining undone."); p.4 CONCEALMENT ("Intentional suppression or withholding of, or neglect to communicate, a

26  material fact.  In contractual arrangements, fraudulent concealment may provide grounds for setting aside (rescission) of a contract and for a claim of damages.").

27  [43] **Exhibit 23**, p.1 (2.201).
   [44] Id., p.4 (2.204).

28  [45] See **Exhibit 24**, p.2 (a journal article detailing Fraud by Omission elements in California).

- 15 -
DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.15**

d)   The plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact; and

e)   As a result of the concealment or suppression of the fact, the plaintiff must have sustained damage.

MATERIALITY AND FAILURE TO DISCLOSE

42. Based upon the facts alleged in the Complaint[46], it appears that a reasonable person would consider the Transmission Defect important and would not have purchased or leased a vehicle equipped with the Transmission Defect were the defect disclosed in advance.

43. Materiality is defined as the principle that had information whose omission or misstatement been disclosed, it may have influenced or changed the judgment of a reasonable person.[47]

44. Here, assuming the Plaintiff would have acted differently (not purchased the vehicle), the fact that the Transmission Defect was not disclosed is material.

APPARENT KNOWLEDGE

45. Based upon Ford's experience with a derivative of the PowerShift Transmission in the European and Australian markets, pre-release testing data and feedback, Technical Service Bulletins, consumer complaints and warranty claims, and data collected on repairs from Ford's computer systems (including AWS, MORS and CQIS) (now called FMC 360), it appears Ford had knowledge of the Transmission Defect before Plaintiff's purchase of the Subject Vehicle on January 29, 2011, and during the warranty period.

---

[46] Exhibit 2.
[47] Exhibit 23, pp.2, 27, 76 (Fraud Examiners Manual, pp.2.202, 4.318, 4.1022).

- 16 -

DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.16**

DUTY TO DISCLOSE

46. Given the materiality and the Defendant's alleged knowledge of the Transmission Defect, I assume that the Defendant had a duty to disclose the Transmission Defect to the Plaintiff.

INTENT TO MISLEAD OR DECEIVE

47. As described above, several facts make it appear as though Ford withheld disclosure of the Transmission Defect in order to induce a reasonable person to purchase or lease a vehicle or, after such purchase or lease, failed to cure the Transmission Defect. These include:

a)   Experience in the European and Australian markets with a similar dual-clutch transmission, for which the PowerShift Transmission is a derivative;

b)   The post production issuance of Technical Service Bulletins in response to complaints about the Transmission Defect;

c)   Post production warranty claims and repairs as part of Ford's informational databases: including MORS (Master Owner Relations System); AWS (Analytical Warranty System); and CQIS (Common Quality Indicator System) (now called FMC 360);

d)   The long history of consumer complaints described above, as well as the alleged Transmission Defect without effective replacement;

e)   That a reasonable person would consider the Transmission Defect important and would not have purchased or leased a vehicle equipped with the Transmission Defect if the Transmission Defect was disclosed in advance; and

f)   That Ford did not disclose the Transmission Defect.

48. Because of the extent of the Transmission Defect (e.g., long history), withholding disclosure of such information appears more than mere coincidence or oversight, but rather more along the lines of an intentional act.

- 17 -

DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.17**

RESPONSIBILITIES OF MANAGEMENT AND DIRECTORS

49. Officers and directors of companies in the U.S. have a responsibility to identify and investigate employee misconduct and deal with any known or suspected instances of misconduct with efficient and decisive measures.  Officers and directors aware of potentially illegal conduct by senior employees may be liable for any recurrence of similar misconduct and have an obligation to halt and cure continuing effects of the initial misconduct.[48]

50. The Corporate Sentencing Guidelines provide penalties for corporations that fail to take voluntary action to redress misconduct by senior employees.[49] Directors and senior management set the moral and ethical tone of an organization, reinforcing the importance of internal controls and expected standards of conduct.  According to the Committee of Sponsoring Organizations, the control environment provides the foundation for internal controls throughout the organization.[50]

51. Under the Sarbanes-Oxley Act ("SOX"), the CEO and CFO of a publicly traded company must certify that the financial reports fairly present, in all material respects, the financial condition and results of the company's operation and do not contain any material misstatement that would render the financials misleading and that disclosure was made to the auditors and audit committee regarding any material weaknesses in controls and any fraud, whether material or not, that involves management or other employees who have a significant role in the company's internal controls.  Internal controls covered include those relating to the prevention, identification and detection of fraud.[51]

52. Senior financial management of Ford likely are CPA's subject to the AICPA Code of Professional Conduct.  As such, according to 0.300.030 of that Code, they have an obligation to act in a way that serves the public interest, honors the public trust, and demonstrates a commitment to professionalism.[52] They have an obligation to discharge their responsibilities with integrity, objectivity, due professional care and a general interest in serving the public.

---

[48] See **Exhibit 23**, p.31 (Fraud Examiners Manual, p.4.402).
[49] Id., pp.31-38, 43-46 (4.402-4.409 and 4.414-4.417).
[50] Id., p.33 (4.404).
[51] Id., pp.46-51 (4.417-4.422).
[52] See **Exhibit 26**, p.7 (AICPA Code of Professional Conduct).

- 18 -
DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.18**

1  53. The Public Company Accounting Oversight Board ("PCAOB") alerts auditors to be alert

2 to intentional misstatements or omissions of amounts or disclosures in financial statements of

3 events, transactions or other significant information.[53]

4  54. An example of a company and senior management taking responsibility would be

5 General Motors' (GM) response to ignition switch issues.  The actions of GM and particularly

6 Chairman and CEO Mary Barra are discussed in a recent article titled "GM shaken up by CEO

7 Mary Barra", by Mark Phelan of USA Today.  Mark Phelan stated that "the company accepted

8 responsibility, apologized and essentially wrote a blank check when a GM employee allegedly

9 concealed faulty ignition switches that led to accidents and multiple deaths."  Mary Barra is quoted

10 as saying "We are going to do the right thing.  We are going to deliver value even when it's hard."[54]

11  55. GM settled with the U.S. Securities and Exchange Commission ("SEC") for $1 million

12 relating to the SEC's investigation of GM's ignition switch recalls.  As part of the agreement, GM

13 did not admit any wrongdoing and GM's financial statements or disclosures were not called into

14 question.  The SEC said that deficient internal accounting controls hindered GM from assessing the

15 financial impact of the faulty ignition switches, which were linked to at least 124 deaths.  The SEC

16 stated that GM's accountants did not learn of GM's internal investigation into the ignition switches

17 until three months before the recall and 18 months after other GM personnel understood that there

18 was a safety issue.  The SEC went on to say that "proper consideration of loss contingencies and

19 assessment of the need for disclosure are vital to the preparation of financial statements that

20 conform with Generally Accepted Accounting Principles."  GM paid billions of dollars in legal

21 settlements and other penalties related to the ignition switches, including $900 million to the U.S.

22 Department of Justice and $595 million through a fund it established for crash victims and their

23 families.   Documents showed the fix would have cost about 57 cents per vehicle at the time of

24 production.[55]

25

26

27

28

---

[53] See **Exhibit 27**, p.3 (PCAOB AU Section 316 Consideration of Fraud in a Financial Statement Audit-.06-Description and Characteristics of Fraud).
[54] **Exhibit 28**, pp. 10, 15.
[55] **Exhibit 28**, pp. 1-2.

DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.19**

REPORTING OF CONTINGENT LIABILITIES

56. Ford's reporting of warranty costs, liabilities and lawsuits relating to the Transmission Defect is covered in its public filings of 10K's and 10Q's as a contingent liability, since the amounts are not reasonably estimable, even though they may be probable. Additionally, they are grouped with all other warranty costs, liabilities and lawsuits, given the magnitude of Ford's size and materiality considerations, so that figures relating specifically to Transmission Defect problems cannot be specifically identified.[56] In FMC's June 30, 2017 10-Q, which is the latest publicly filed financial statement report as of the time of my declaration, other liabilities are reported in Note 11 to the financial statements and show dealer and dealers' customer allowances and claims of $13.8 billion and litigation and claims are reported in Note 16, which include those relating to alleged product defects and product warranties.[57]

### Damages

57. As alleged in the Complaint, a reasonable person would consider the Transmission Defect important (material) and would not have purchased or leased a vehicle equipped with the Transmission Defect were the Transmission Defect disclosed in advance.[58] I have assumed liability, particularly considering the observations summarized in the timeline provided in **Exhibit 30, Schedule 6.**

RESCISSION

58. As shown in **Exhibit 3,** the Plaintiff purchased a 2011 Ford Fiesta VIN: 1FADP4FJ7BM207799 on January 29, 2012.[59] It is my understanding that Plaintiff retains ownership of the vehicle[60].

---

[56] **Exhibit 29** – Ford Motor Company SEC filings.
[57] **Exhibit 29** – Note 11 and Note 16 to Ford Motor Company 10-Q ending March 31, 2017.
[58] **Exhibit 2,** ¶54.
[59] **Exhibit 3.**
[60] **Exhibit 35,** pg 23.

- 20 -
DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.20**

59. The total cash price of the vehicle including accessories, options and other fees was $17,155.02.[61]  Based on total due and a cash down payment of $500.00 Plaintiff financed $16,655.02 at a 4.90% interest rate for a total of 60 equal monthly payments of $314.16 beginning March 14, 2012 and ending February 14, 2017.[62]

60. I have not received any actual payment information for the loan taken on the Subject Vehicle; however, for purposes of this declaration, it has been assumed that all payments have been made according to the terms of the Retail Installment Agreement.  As of the assumed trial date, September 15, 2017, the Plaintiff will have paid $18,850 in payments and $500 down payment, for a total of $19,350 for the Subject vehicle.[63]  Pre-judgment interest at 10% simple per annum to the assumed trial date is $6,023.  The total historical amount paid by Plaintiff for the Subject Vehicle plus pre-judgment interest is $25,373.[64]

OUT-OF-POCKET COSTS FOR RELATED REPAIRS

61. It is my understanding that Plaintiff did not incur any Out-of-pocket Costs for related repairs.[65]  If or when such information is received, the declaration will be updated.

OTHER OUT-OF-POCKET COSTS

62. Plaintiff incurred other costs related to the care for the Subject Vehicle.  As of the date of this declaration, I have received receipts for other out-of-pocket costs paid in the total amount of $1,481.  Total out-of-pocket costs considering prejudgment interest at 10% simple per annum to the assumed trial date are $1,986.[66]  If and when additional other out-of-pocket costs, such as insurance, additional registration and maintenance costs, are provided, the analysis will be updated.

---

[61] Id., p.2.
[62] Id., pp.1-2.
[63] **Exhibit 30**, Sch. 2.
[64] **Exhibit 30**, Schedule 1.
[65] **Exhibit 30**, Schedule 3.
[66] **Exhibit 30**, Schedule 3.1 and **Exhibit 31**.

- 21 -
DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.21**

SUMMARY OF RESCISSION AND OUT-OF-POCKET COSTS

63. As shown in **Exhibit 30**, Schedule 1, the total historical cost of purchase to the assumed trial date of September 15, 2017 is $19,350.  Pre-judgment interest at 10% simple per annum to the assumed trial date is $6,023, and the total amount of historical cost plus pre-judgment interest is $25,373.  There are no out-of-pocket repair costs to date pursuant to warranty repairs.

CURRENT LOAN BALANCE

64. As noted above, I have not received any actual loan payment information; however, for purposes of this declaration, it has been assumed that all payments have been made according to the terms of the purchase agreement.  Based on this assumption, there is currently no balance due.[67]

TOTAL COSTS

65. As shown in **Exhibit 30**, since there is no balance currently due, the historical amounts paid to purchase the vehicle and repair costs through the date of trial (excluding other out-of-pocket costs), yields a total sum of $19,350 (or $25,373 considering pre-judgment interest).[68]

66. As shown in **Exhibit 30**, the current loan balance of $0.00, the historical amounts paid to purchase the vehicle, repair costs and other out-of-pocket costs through the date of trial, yields a total sum of $20,831 (or $27,359 considering pre-judgment interest).[69]  These figures will be updated if or when other out-of-pocket costs are provided.

PUNITIVE DAMAGES

67. Punitive damages are addressed in *State Farm Mutual Ins. Co. v. Campbell et al.*, 538 U.S. 408 (2003)[70] and *Johnson v. Ford Motor Co.*, 135 Cal.App.4th 137 (2005)[71].  Based upon my experience as a forensic accounting and damages expert, it is my understanding that the objective of

---

[67] **Exhibit 30**, Schedule 2 and **Exhibit 35**, pg. 34
[68] Id., Schedule 1.
[69] Id.
[70] **Exhibit 32**.
[71] **Exhibit 33** (on remand from the California Supreme Court, see **Exhibit 34**).

DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.22**

1   punitive damages is to deter a defendant from repeating intentional willful bad acts.

2       68. In general, while there is no "bright-line ratio which a punitive damage cannot exceed",

3   generally, the ratio between punitive and compensatory damages is a "single-digit ratio".[72]

4       69. In *Johnson v. Ford*,[73] a California case where the manufacturer concealed the

5   automobile's history of transmission repairs and replacements when reselling the car, the *State*

6   *Farm* analysis is applied, ultimately finding a ratio of just under 10-to-1 as appropriate.[74] There, in

7   analyzing the third prong of the *State Farm* analysis, the court found that the punitive ratio should

8   be greater than the 2-to-1 Song-Beverly civil penalty "willful" standard because the "defendant

9   *intentionally* concealed information with the *intent* to defraud Plaintiff....[T]he present intentional

10   conduct (based, as it was, on formal companywide practices and policies) was significantly more

11   egregious than the minimum 'willful' conduct sufficient to support a Song-Beverly civil penalty."[75]

12       70. While I am not a lawyer and do not presume to opine on legal analysis, here, I have

13   considered the final punitive damage award in the *Johnson v. Ford* matter[76] and provide a

14   placeholder quantification of punitive damages.  I also have given talks on punitive damages to

15   accountants and attorneys from an accounting perspective, have been on panels focusing on

16   punitive damages and have presented accounting expert testimony on punitive damages.

17       71.  Assuming punitive damages at 9x the underlying compensatory damages excluding

18   other out-of-pocket costs, punitive damages are $174,150, yielding total compensatory and punitive

19   damages of $193,500.  Considering pre-judgment interest, the total compensatory and punitive

20   damages are $199,523.[77]

21       72. Including other out-of-pocket costs in the underlying compensatory damages, punitive

22   damages at 9x the underlying compensatory damages are $187,479, yielding total compensatory

---

[72] **Exhibit 32**, p.11.
[73] **Exhibit 33**.
[74] **Exhibit 33**, pp.1 and 9 (9.83x punitive-to-compensatory ratio based on $175,000 punitive damages to $17,811.60 compensatory damages).
[75] Id., p.8.
[76] **Exhibit 33**, pp.1 and 9 (9.83x punitive-to-compensatory ratio based on $175,000 punitive damages to $17,811.60 compensatory damages).
[77] **Exhibit 30**, Schedule 4.

DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.23**

1  and punitive damages of $208,310.  Considering pre-judgment interest, total compensatory damages

2  (including other out-of-pocket costs) and punitive damages, the total is $214,838.[78]  These figures

3  will be updated if or when other out-of-pocket costs are provided.

4       73. As of June 30, 2017, the last date for which stand-alone information is publicly available

5  for Ford Motor Company, Ford had a net worth of $32,262 million.[79]  Punitive damages (wherein

6  other out-of-pocket costs are excluded from underlying damages) of $174,150 represent 0.0005% of

7  the net worth of Ford Motor Company as of June 30, 2017.  For the trailing twelve months ended

8  June 30, 2017, Ford Motor Company had net income of $3,803 million.  Punitive damages

9  (excluding other out-of-pocket costs) of $174,150 represent 0.0046% of the net income of Ford

10  Motor Company for the trailing twelve months ended June 30, 2017.[80]

11       74. As of June 30, 2017, the last date for which stand-alone information is publicly available

12  for Ford Motor Company, Ford had a net worth of $32,262 million.[81]  Punitive damages (wherein

13  other out-of-pocket costs are included in underlying damages) of $187,479 represent 0.0006% of

14  the net worth of Ford Motor Company as of June 30, 2017.  For the trailing twelve months ended

15  June 30, 2017, Ford Motor Company had net income of $3,803 million.  Punitive damages,

16  (including other out-of-pocket costs) of $187,479, represent 0.0049% of the net income of Ford

17  Motor Company for the trailing twelve months ended June 30, 2017.[82]  These figures will be

18  updated if or when other out-of-pocket costs are provided.

19

20

21

22

23

24

25

26  [78] Id.
   [79] See Exhibit 29.

27  [80] Exhibit 30, Schedule 5.1.
   [81] See Exhibit 29.

28  [82] Exhibit 30, Schedule 5.1.

- 24 -

DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.24**

1

2  **Pending Information**

3      75. If I receive additional information, my declaration will be supplemented accordingly.

4

5      76. I declare under penalty of perjury under the laws of the State of California that the

6  foregoing is true and correct and that this declaration has been executed on August 22, 2017 at

7  Sherman Oaks, California.

8                              Dr. Barbara C. Luna

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DR. BARBARA C. LUNA

**EXHIBIT 68.25**